JUDGE WILLIAMS
delivered the opinion op the codrt:
Ashbrook was indicted for keeping a common nuisance in the city of Covington, from June 25th, continuously, until September 13th, 1865. This indictment was returned into court September 14th, 1865. January 4th, 1866, the jury sworn to try the issue returned a verdict of “ guilty,” and assessed his fine at twenty-five dollars, upon which the court gave judgment the same day. January 12th, the defendant’s motion for a new trial was overruled.
January 20th, the court made an order that the defendant “ do, on or before the 12th day of March next, abate the nuisance by ceasing to use said pens for the purpose of impounding of either horses, mules, cattle, or hogs; and, upon his failure to comply with this order, then the sheriff of this county will be ordered to enforce this . judgment.” This appeal seeks a reversal of these judg- j ments and orders.
The indictment alleges that the defendant kept, at a certain locality in said city, sundry pens, wherein he kept large numbers of horses, mules, cattle, sheep, and hogs; and,, bjvjjeason of their filthy excrements, there arose , unneaMwaiid pernicious smmlsf and the air was greatly corrupted and infected to the great damage of the citizens residing and dwelling there, and of those passing and repassing.
This locality had been so used by the defendant and those under whom he claimed for at least thirty years;. and when so first used it was entirely outside of the city limits, some distance in the country, and near to which there then were no settlements.
Covington was then a village of about five hundred souls; it now has a population of twenty thousand. The commerce and prosperity and increase of popula *141 tion of the city now demands this locality for dwellings and other business purposes, and streets have been extended by it. The continuance of the use of said pens for their original purpose is detrimental to the public good, and injurious to the citizens residing in their immediate vicinity; but as the use and purposes of the pens were lawful when first established, can such now be declared to be a common nuisance, and the proprietor prohibited from the exercise of such use ? I
In Cross’ case (2 C. & P., 483) Abbott, C. J., said: “ If a noxious trade is already established in a place remote from habitations and public roads, and persons afterwards come and build houses within the reach of its noxious effects, or if a public road be made so near to it that the carrying on the trade becomes a nuisance to the persons using the road, yet ^jie party is entitled to continue his fTade, because it was legal before the erecting of the .houses or the making of the road.” (Roscoe's Grim. Ev., 661, by Sharswood, 1836 ; and so it was held in Ellis vs. State, 7 Blackf., 534.) But these cases did not involve the pub-1 lie rights, and demands of cities and their populations. *
In Commonwealth vs. Upton (6 Gray, 473) the supreme court of Massachusetts held, that “ carrying on an offensive trade for twenty years, in a place remote from buildings and public roads, does not entitle the owner to continue it in the same place after houses have been built and roads laid out in the neighborhood.”
In Brady vs. Weeks (3 Barbor's S. C. R., 157) the New York court, held, that “persons who have purchased land and built dwelling-houses in the neighborhood of a slaughter-house, in a part of a city which is becoming thickly settled, may maintain a bill in equity to restrain the use of the slaughter-house as being a nuisance, although it was erected previous to their purchase of the land.”
*142 Mr. Greenleaf, in his second volume on Evidence, page 472, section 473, says: “ So, if the act of the defendant was at first no annoyance, he cannot recover. This rule, however, admits of some qualification where the nui- ' sanee affects the entire dwelling; for the right of habitancy is paramount to the exigencies of trade. Thus, where a slaughter-house was erected in the open fields adjacent to a growing city, but not at that time near to any dwelling-house, but afterwards, in the progressive increase of the city, dwellings were erected near to the slaughterhouse, insomuch that it rendered them unfit for comfortable habitation, it was held a nuisance, for which the owners of the houses^might have remedy against the proprietor of the slaughter-house for its continuance;” and refers to Brady vs. Wecks. Cited Cooper vs. Barber, 3 Taunt., 99; Dana vs. Valentine, 5 Met., 8; Gale Whaley on Easements, 186.
The right of the Legislature to extend the corporate \ limits of towns and cities, for the purpose of local government, over even unwilling populations, and the power rap exercise the right of eminent domain in extending their (streets against the will of the proprietors of the soil, and leven in condemning for town purposes tracts of land /without the owners’ consent, has been often recognized by this court. The exercise of these rights and powers is often demanded by the wants of a large, dense, and. increasing population and its incidental commerce; and every proprietor may be regarded as holding his property subject,to these superior rights of the public.
A proprietor cannot be compelled to sell his land to private individuals, but he can be compelled to surrender the use of so much of it as may be necessary for public use, roads, and streets, on just compensation; and the Commonwealth, having the right to appropriate the land *143 to public uses, must necessarily have the power to protect the public in this use, else the right to appropriate would be quite imperfect.
A contumacious holder of real estate cannot retard the public of a city, by refusing to let streets run through his land; nor can he, by a noxious trade or pursuit, deprive the public of the use after its appropriation.
It seems to us that the right to reserve property for j _ public use must necessarily include the power to protect (' the public in its use, as well by the abatement of a common nuisance- in the neighborhood as upon the road or street itself. (f
The pursuit of a noxious trade is lawful so long as>* it does not interfere with the rights of the public*; but when it does so interfere with these superior rights, it becomes illegal,land no length of time can sanctify it, as* , its exercise is a daily renewal of the offense.) ^
Whilst many private rights will be protected from public invasion because not necessary to the public good, ^ yet most of the individual rights are held subordinate to [ the public welfare.
However conflicting the evidence might be regarded, yet the jury, in_tMs case have found that it was a nuisance, and we cannot determine that it was not; and as we do not regard the prior occupancy of the property for such purpose, before the increasing population of the city and public necessity required the extension of the city limits and streets beyond this property, as a legal defense, we cannot reverse the judgment for this cause.
It is again insisted that the offense is not laid in the indictment as continuing, and therefore the order of abatement was erroneous.
The offense is averred to continue up to the day before the indictment was returned into court, and probably up • *144 to the day the indictment was found. It would perhaps have been more in accordance with legal proceedings in such cases to have laid it with a continuance from a given day up to the finding of this indictment; but we think it substantially good as a continuing offense, and the verdict and judgment being against defendant, the court properly ordered him to abate the nuisance by a given day; and should it then be made known that defendant has failed to do so, the court, by subsequent proper orders, may have it abated.
'W.e do not understand that the offensive odors and ^smells of a loathsome tr.
ease^tuUñácome a~cóññmdii~nuisance; if it is detrimental to the*comfort oTthose dwelling’ around it, and to the ^passers-by, it is a nuisance, and may be abated.
The instructions given comport with the view we have taken, and perceiving no available error, the judgment is affirmed.