City of Waterloo, Appellee, v. Waterloo, Cedar Falls & Northern Railway Company, Appellant.

**Public nuisance:** OBSTRUCTION TO A STREAM: ABATEMENT: EVIDENCE. In this action to restrain the obstruction of an arm or division of a river near the plaintiff city, on the ground that the damming of the water constituted a public nuisance, the evidence is reviewed and held to show that the enhanced danger, severity of floods and attendant evils from stagnant water, constituted a nuisance entitling the city to a decree for abatement thereof.

**Same:** DEFENSES. The fact that the plaintiff·city had been subject to overflow is not a defense to an action to abate a nuisance arising from damming the stream, as in this case, resulting in an increased overflow of the waters.

**Same.** There is no such thing as a vested right to maintain a public nuisance. And although riparian owners may estop themselves from objecting to the maintenance of an obstruction to a stream, no vested right is acquired thereby as against the public. Nor can the right to maintain a public nuisance be acquired by lapse of time, long continued usage, or by prescription. Nor is it any answer to an action to abate a public nuisance that when the same was created it injured no one, and has only become a nuisance because the increase of population has brought the people within the radius of the nuisance.

**Same:** POLICE POWERS. It is the duty of a city in the exercise of its police power to keep its streets in repair and unobstructed; and

this duty involves the right to abate as a nuisance a dam which obstructs a stream, thereby increasing the flow of flood water over a portion of the city and its streets.

**Same.** A property owner holds his title subject to the power of the state to regulate its use and enjoyment so as to prevent and abate a public nuisance, and the enforcement of that power works no legal wrong.

*Appeal from Blackhawk District Court.*—HON. CHARLES E. RANSIER, *Judge.*

MONDAY, APRIL 11, 1910.

ACTION in equity to restrain defendant from interfering with or obstructing the passage of water in an alleged stream or natural water course. There was a decree as prayed, and the defendant appeals.—*Affirmed.*

*Mullan & Pickett,* for appellant.

*B. F. Swisher* and *Boies & Law,* for appellee.

WEAVER, J.—The Cedar River approaches the city of Waterloo from the northwest. As it nears the city boundary, the main channel sweeps around a bend to the eastward, while a lesser channel, known in the record as the "cut-off," flows across the neck of the bend and reunites with the larger stream within the city limits. The defendant's line of railway emerges from the business portion of the city, and extends in a northwesterly direction crossing the cut-off above mentioned. At the time when the road was constructed, this point of crossing was outside of the city limits, but, since that date, the boundary of the municipality has been extended to include the locality in question and for some distance beyond. The island lying between the greater and lesser channels of the river con-

tains about three hundred acres of land, the higher and dryer portion of which has been platted as a park or pleasure ground.   Both sides of the principal channel in this vicinity are much resorted to in the summer season by the people of Waterloo and others.   Before constructing its road, the railway company obtained a right of way from the owners of property traversed by its line, and waivers of claims for damage caused by overflow of water were also obtained from adjacent owners or some of them. Said road was constructed about the year 1897.   No bridge was provided for crossing the cut-off but the roadway was carried over or across it on a solid embankment or fill. Later a public highway was established and opened immediately west of the fill and parallel thereto, and was carried across the cut-off on a wooden bridge erected by the city. A portion of the island is somewhat low and in times of extreme high water has been to a greater or less extent subject to overflow.   A considerable part of the highway above mentioned in its course across the island is at times subject to inundation.   When the floods are excessive, the waters sometimes break through or over the western bank of the cut-off, and flow over the surface or through swales in a southerly direction, and across a platted addition, to the city known as Westfield, where several manufacturing establishments are located.   On the night of March 27, 1906, there was a heavy fall of rain with resulting high water in the streams.   It is the claim of plaintiff that, on this occasion, the body of water in the cut-off above the fill made by the railway broke through said barrier, and washed away a portion of the embankment, taking with it the bridge constructed by the city, and otherwise injuring the highway.   To prevent the reconstruction of said embankment and to compel the maintenance of an adequate opening therein.for the passage of the waters of the cut-off, this suit was thereupon instituted.

The petition sets forth the matters and things herein-

before mentioned, and alleges that the effect of maintaining
the fill constructed by defendant is to obstruct a natural
water course; that such obstruction tends to increase the
height of the floods above the crossing, and thereby fill
the low places with water, which remains after the floods
have subsided and creates stagnant pools; that the debris
and foul matter thus deposited create unhealthful conditions,
and materially interfere with the health, comfort, and con-
venience of residents and visitors in that neighborhood;
that the floods so caused injure the public highways, and
at times extend to the Westfield addition, depositing mud,
sand, and other materials in its streets, and that the con-
ditions complained of will continue indefinitely if the
defendant is permitted to continue the obstruction of the
cut-off.     The defendant denies that the maintenance of
the cut-off has caused, or can cause, any injury as alleged
in the petition.     It further avers that said fill was con-
structed with the consent of the riparian owners, and
that, in fact, the maintenance of said fill has prevented
the enlargement of the cut-off, which was otherwise liable
to divert the main channel from its long established course,
to the great injury of the public as well as of the adjacent
owners of land.     It also alleges that the filling of said
channel was well known at the time by the city and its
officers, who permitted the work to be done and the rail-
way to be constructed there without objection or protest,
and that the city is thereby estopped from maintaining this
action.     Other matters are mentioned in the pleadings,
but none to which we need here specifically advert.     At
the close of the testimony, the trial court entered a decree
finding for the plaintiff upon the principal fact questions
in issue, and that the filling of the cut-off had the effect
to raise the waters so held back to an unnatural level
resulting in conditions, constituting a public nuisance,
by reason of which the city was entitled to an injunction
against its maintenance, but, the court not being fully

advised as to the extent to which an opening should be made and maintained for the passage of water in the cut-off, an order was entered appointing a commission of three engineers to examine the premises and report thereon. A majority of the commissioners thereafter reported as follows:

(1) That the removal of the cut-off embankment for a space of eighty feet along the line of the fill will prevent any material increase of the flow of water upon the streets and grounds of the city in time of ordinary freshets.

(2) The dimensions of such opening should be eighty feet in length by fifteen feet in height.

(3) The location of the opening should be at the present channel of the cut-off. The type of construction recommended to provide for such opening is a through plate girder bridge eighty feet in length in the clear upon concrete abutments, the lowest member of which bridge not to be lower than the lowest member of the present steel railway bridge (over main channel) at San Souci Park.

(4) The estimated cost of such improvement is $7,500, and the time required for its completion ninety days.

On the coming in of this report, the court entered formal decree enjoining the defendant from maintaining the fill across the cut-off, unless the same be supplied with an opening therein at the present channel of eighty lineal feet along the line of the embankment and at least fifteen feet in height. The date of this entry was November 15, 1907, and the defendant was given time to March 1, 1908, to comply with the terms of the degree.

I. The appellant contends that the evidence wholly fails to sustain the claim that the effect of the fill was to increase the flood waters above it, or to increase the liability of flooding and injuring the streets and highways. Without reciting the testimony of individual wtnesses, an examination of the record convinces us that the finding of

the trial court upon this feature of the controversy is cor-
rect. In the very nature of the case such
result was unavoidable. The course of the
cut-off from its point of departure from
the main channel above the park to the
point where they unite below is not to exceed half of the
distance of the flow of the principal stream around the
bend. The shorter course must, therefore, have averaged
a materially greater fall per rod or per mile than the
longer course, and the cut-off with the freedom of an open
channel could scarcely fail to furnish material relief in
carrying off the waters escaping from the main body. If
it did not always serve to prevent the flooding of parts
of the island, it would naturally help in keeping the inunda-
tion at a minimum, and in draining off the excess of water
when the subsidence began. To fill the stream with a
solid embankment was to build a dam which wholly arrested
the flow. That this should to some extent increase the
height of the floods above the dam and broaden the area
of overflow and retard its recession was inevitable. That
it should increase the obstruction of the public highway
and the danger of obstruction or injury to the bridge beyond
that which would exist without the fill is reasonably clear.
There is also sufficient evidence that as a result of these
overflows many pools were left to stagnate, and that from
these and the decaying debris left by the floods disagreeable
odors arose to the inconvenience and annoyance of the
people in that vicinity, if not to the peril of the public
health. Considerable testimony was directed to the question
whether the fill in question caused the diversion of water
overflowing the west bank and reaching the Westfield addi-
tion, but we think this phase of the case may be wholly
disregarded, and still find the record sufficient to sustain
the court's finding that the effect of the fill was to create
a nuisance.

Moreover, if appellant's contention be correct that the

1. PUBLIC NUI-
SANCE: ob-
struction to
a stream:
abatement:
evidence.

site of Westfield has always been subject to overflow, it
would afford no sufficient answer to the charge that the
damming of the cut-off has a tendency to
increase the diversion of water in that direc-
tion, and thereby enhance the severity of such floods.

2. SAME: de-
fenses.

II.   Appellant claims that having obtained waivers of
damage from riparian owners, and having constructed the
fill before the neighborhood was included within the city,
it acquired a vested right to maintain such
fill, which neither the city nor the court can
rightfully impair by ordering the opening of a way for the
passage of the stream.   The riparian owners could estop
themselves from objecting to the maintenance of the ob-
struction, and, so far as such obstruction constitutes a
private nuisance to the injury of such property owners,
the defendant may have acquired vested rights therein, but
there can be no such thing as a vested right to maintain
a public nuisance.   Nor can a right to maintain such
nuisance be acquired by lapse of time or long-continued
usage or by prescription.   *Commonwealth v. Upton,* 6 Gray
(Mass.) 473; *Wright v. Moore,* 38 Ala. 593 (82 Am. Dec.
731).   Nor is it an answer to say that, when the work
was done, it injured nobody, and has only become a source
of trouble or annoyance because the increase of population
has brought people within closer range of its objectionable
influence.   *Douglass v. State,* 4 Wis. 387; 29 Cyc. 1207.

3. SAME.

It is upon the ground that the damming of the stream
creates a public nuisance that relief against it was granted
by the trial court, and upon that ground we think it may
be maintained.   To say nothing of the effect of the over-
flows upon public comfort or public health, the statutory
duty of the city to keep its streets in repair and free from
obstruction, and from the inroads of flood waters, is suffici-
ent grounds to justify its insistence upon the opening of
the channel to the natural flow of the stream.   The fact
that the fill was constructed before the city limits were

extended to include its site does not exempt the defendant from the operation of the law in this respect. A dam or other obstruction of the stream may be lawful when made, but, if for any reason it later becomes or causes a nuisance, the legitimate character of its origin will not defeat an action for its abatement. *State v. Close,* 35 Iowa, 570; *Yonkers v. Copcott,* 140 N. Y. 12 (35 N. E. 443, 23 L. R. A. 485).

Nor, as we have already suggested, is the general police power of the state or city to suppress nuisances in any manner limited by the fact that a nuisance did not develop

4. SAME: police powers.

into a source of injury to any one until the subsequent growth and expansion of the city brought people into a position to be injuriously affected by it. *Bushnell v. Robeson,* 62 Iowa, 547 (17 N. W. 888); *Ashbrook v. Commonwealth,* 1 Bush (Ky.) 139 (89 Am. Dec. 616).

As between the property owner and the public, the inquiry goes to the conditions existing at the time when the complaint is made, and not to those prevailing at some

5. SAME.

more remote date in the past. The question to be decided here involves no vested right. Every owner of property holds title thereto subject to the authority of the state to so regulate its use and enjoyment as to prevent and abate public nuisances, and the enforcement of that authority works no legal wrong. None of the authorities cited by counsel hold counter to this proposition. The law of the case is involved in no doubt, and we are of the opinion that the testimony sustains the decree of the trial court.

For the reasons stated, the decree is *affirmed.*