## Petroleum Refining Company v. Commonwealth.

(Decided June 24, 1921.)

### Appeal from Kenton Circuit Court (Criminal, Common Law and Equity Division).

1. Nuisance—What is a Nuisance.—As a general rule, every unlawful use by a person of his own property in such a way as to cause material annoyance, discomfort or hurt to other persons, or the public generally, and every enjoyment by one of his own property, which violates the rights of another in an essential degree, constitutes a nuisance.

2. Nuisance—Public Nuisance—Private Nuisance.—A nuisance is public where it affects the rights enjoyed by citizens as part of the public, that is, the rights to which every citizen is entitled, whereas a private nuisance is anything done to the hurt, annoyance or detriment of the lands, tenements or hereditaments of another.

3. Nuisance—Nuisances Determined by Their Effect Upon Persons of Ordinary Health and Average Sensibilities.—Whether a particular annoyance is such as to constitute a nuisance depends on its effect upon persons of ordinary health and average sensibilities, and not on its effect upon persons who are delicate or super-

sensitive, or whose habits, tastes or condition are such that they are never sensible of any annoyance.

4. Nuisance—When Noxious Gases and Offensive Odors Constitute a Nuisance.—A nuisance may consist in the emission of noxious gases or offensive odors in such quantities as to injure the health or materially interfere with the comfort of the public.

5. Nuisance—Abatement—When Order Closing Business Should Be Made.—In determining whether or not defendant is guilty of maintaining a common nuisance, the acts complained of must be viewed in the light of all the surrounding circumstances and conditions, and if when so viewed, they constitute a nuisance, the nuisance may be abated; but the extraordinary remedy of closing the business entirely should not be resorted to unless the evidence be clear and convincing not only that the nuisance actually exists, but that it is maintained by the defendant.

6. Nuisance—Abatement—Closing of Plant—Sufficiency of Evidence.—On a proceeding by rule against the defendant to show cause why it should not be punished for contempt for its failure to comply with an order abating a nuisance, evidence examined and held that on the showing made below, an order closing the plant should not have gone, but that the rule should have been discharged.

MYERS & HOWARD and R. E. WESTFALL for appellant.

CHAS. I. DAWSON, Attorney General, THOS. B. McGREGOR, Assistant Attorney General, and STEPHENS L. BLAKELY, Commonwealth's Attorney, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing and discharging rule.

During the year 1919 the Petroleum Refining Company was organized with a capital of a half million of dollars, for the purpose of refining Kentucky crude petroleum and marketing the product. In order that it might have the requisite transportation facilities, as well as the necessary labor to carry on the business, it acquired a site on the main line of the Louisville & Nashville Railroad at a point about a quarter of a mile west of the western limits of the city of Covington, and there constructed its plant. The plant is surrounded on the north, south and west by farming lands, and on the east by the Latonia race track and the railroad switching yards. Operations were begun in the month of October, 1919. On May 29, 1920, the grand jury of Kenton county returned an indictment charging the company with the offense of unlawfully maintaining a common and public nuisance, in that its refinery, in the process of distilling oils, ''unlawfully, unnecessarily and unreasonably caused

to be emitted noisome, nauseating, dangerous, unhealthy and destructive gases, fumes and odors, to the great discomfort, ill health and inconvenience of the residents and citizens residing in said neighborhood, and also to the injury of their goods and property." The case was not called for trial until March 22, 1921. On March 24, 1921, the jury returned a verdict of guilty and fixed the company's punishment at a fine of $500.00. On motion of the Commonwealth's attorney, the circuit court entered an order of abatement, directing the company to abate the nuisance of which it had been adjudged guilty and "to cease to permit said nauseating, danger- ous and unhealthy gases, fumes and odors to escape from its refining plant, wherein crude oil is distilled in quan- tities sufficient to impregnate the air, and to render same offensive and harmful to the health, comfort and prop- erty of individuals."

On April 2nd the Commonwealth's attorney filed an affidavit to the effect that the order of abatement had not been complied with, and asked for a rule against the com- pany to show cause why it should not be punished for contempt for its failure to obey the order of abatement. The rule was granted and made returnable April 7th. The company filed a response alleging, among other things, that prior to the return of the indictment they had conducted their plant as other plants were conduct- ed, that is, they permitted the gases and odors to be car- ried off by the air; but that since that time, out of an abundance of precaution, they had put in use certain de- vices and appliances by which all odors were neutral- ized, and all noxious gases were practically consumed. After hearing evidence on the question the circuit court decided that the nuisance had not been abated and en- tered an order directing the sheriff to close the plant. The company appeals.

On the trial of the indictment Dr. H. C. White, the county health officer, who was not a practical chemist, but had studied chemistry in his medical course, de- scribed the location of the plant and explained the method employed in the distillation of crude petroleum. He further stated that when the crude oil was heated, cer- tain gases were thrown off. First comes nethane, or marsh gas, which is odorless, then petane, which is also odorless. Next in order is gasoline, then benzine, then coal oil and then the residuum, known as fuel or road oil.

Certain impurities known as hydrogen sulphide and sulphur dioxide are also liberated. Sulphur dioxide has no odor but hydrogen sulphide has the odor of rotten eggs. There was no odor at the plant because these gases are carried into the air through the smoke stack, and are then scattered by the prevailing wind, and being heavier than air, they descend at places some distance from the plant. After having his attention called to the furnace and other appliances used to consume the gas, he was asked if he was of the opinion that any part of the poisonous gases was thrown off after being passed through the furnace. His reply was as follows: "I want the jury to understand that it is possible for it to be done. This H 2 S is not consumed under 400 degrees Fahrenheit. I have no way in the world to know they always keep that at 400 degrees temperature Fahrenheit." He was then asked the following question:

"Q. Then you don't know whether any of that poisonous gas is thrown out on the community at this time, since the introduction of this gas to the furnace?

"A. I say I don't know that."

He also stated that from his personal knowledge and experience he could not say that prior to May 24th there was an escape of gas sufficient to produce sickness or illness in the community. He further testified that in the spring of 1920 the paint on a number of houses in the vicinity of the plant was discolored. This was due to the chemical action of the hydrogen sulphide on the lead in the paint. Other witnesses then testified to the prevalence of offensive odors prior to the return of the indictment, and said that the smell was like that which came from rotten eggs.

On the trial of the rule, thirteen witnesses testified for the Commonwealth. Their evidence in brief is as follows. Dr. White testified that since the trial of the indictment he had noticed disagreeable odors in Latonia, and though he said that the odor was practically the same as it was before, he described the odor as that of burnt gasoline. On cross-examination he stated that there was a number of old vaults in Latonia which he judged sometimes gave off obnoxious odors. There are also seven or eight engines in use at the railroad yards which are switching practically all the time. He also explained that there were certain dumps where the garbage of the city was deposited. Harry L. Deming, the manager of the company, testified that since March 22, 1921, there

had been no change in the method of destroying fumes arising from the plant. The changes had been made in May, 1920, and in the following September. Before the new methods were installed, the gases escaped in the open air. In his opinion, the new appliances neutralized the odors and consumed all noxious gases. Since the order of abatement, no such gases had escaped. Other witnesses, who lived at distances varying from one-fourth mile to several miles from the plant, testified to the prevalence of offensive and nauseating odors since the trial of the indictment. Some said that the odor drifted with the wind. Others said that it was more offensive when there was no wind at all. Some noticed the odor when the wind was in the opposite direction. Generally the condition was worse at night than in the daytime. The odor which they smelt was variously described by the witnesses, some saying that it smelt like sulphur or rotten eggs, others that it smelt like burnt gas or sulphuric acid. Some of the witnesses said that the odor penetrated the houses and would wake them up at night. When this occurred, it was very difficult to get the odor out of the room. It made the throats of some dry and their breathing difficult, while it gave others a headache or made them sick at the stomach. The witnesses did not notice these odors prior to the establishment of the refinery.

About seventy witnesses testified for the company. Some of these witnesses lived on the same streets as the witnesses for the Commonwealth and only a few feet away. Some of them stated that they had never smelt any disagreeable odors whatever. Others said that a few months back they had noticed the odor of crude oil or gasoline, but these odors were never offensive or nauseating. Others testified that they had at times detected certain odors which they supposed came from the plant, but these odors had ceased and they were no longer able to detect them. G. C. Smith, professor of chemistry at the University of Cincinnati, testified that he was asked by Dr. White to examine the plant of the company. He visited the plant, examined the appliances in use, analyzed the flue gases and gave it as his opinion that the combustion of the gases was practically complete and that it was impossible for noxious gases to escape in such quantities as to affect the health or comfort of the people. He further stated that the gas from a locomotive using bituminous coal would be much more objectionable than that escaping from the plant. To save time it was stip-

ulated that Dr. C. K. Francis and Dr. A. H. Davis and Professor William G. Leamon, who were all experienced chemists, if asked the same questions on direct cross-examination, would testify to the same effect. Dr. Charles Francis, chief chemist and technical superintendent of Cosden & Company, who was educated at Brown University, University of Missouri and University of Illinois, and obtained his doctor's degree in 1899, testified that he had visited a number of plants like that of defendant, and he had never seen such extraordinary precautions taken. In his opinion, the combustion of flue gases was complete, and that more hydrogen sulphide escaped from the stack of a locomotive than did from the defendant's plant.

The principles of law applicable to a case of this kind are well settled. As a general rule, every unlawful use by a person of his own property in such a way as to cause material annoyance, discomfort or hurt to other persons, or the public generally, and every enjoyment by one of his own property, which violates the rights of another in an essential degree, constitutes a nuisance. 29 Cyc. 1156; Froelicher v. Southern Mar. Works, 118 La. 1077, 43 So. 882; Davis v. Sawyer, 133 Mass. 289, 43 Am. Rep. 519; Pa. Lead Company's App., 96 Pa. St. 116, 42 Am. Rep. 534; Baltimore, etc., R. Co. v. Fifth Baptist Church, 108 U. S. 317, 27 L. Ed. 739. A nuisance is public where it affects the rights enjoyed by citizens as part of the public, that is, the rights to which every citizen is entitled, whereas a private nuisance is anything done to the hurt, annoyance or detriment of the lands, tenements or hereditaments of another. 29 Cyc. 1152; State v. Luce, 9 Houst. 396, 32 Atl. 1076. Whether a particular annoyance is such as to constitute a nuisance depends on its effect upon persons of ordinary health and average sensibilities, and not on its effect upon persons who are delicate or supersensitive, or whose habits, tastes or condition are such that they are never sensible of any annoyance. Wade v. Miller, 188 Mass. 6, 73 N. E. 849, 69 L. R. A. 820; Columbus Gas, Light, etc., Co. v. Freeland, 12 Ohio St. 392. The authorities are agreed that a nuisance may consist in the emission of noxious gases or offensive odors in such quantities as to injure the health or materially interfere wth the comfort of the public. Pa. Lead Company's Appeal, *supra;* Booth v. Rome, etc. R. Co., 140 N. Y. 267, 35 N. E. 592, 37 A. S. R. 552; Ashbrook v. Commonwealth, 1 Bush 139, 20 R. C. L., p. 443, sec. 58;

People v. Detroit White Lead Works, 82 Mich. 471, 46 N. W. 735, 9 L. R. A. 722. In determining whether or not the defendant is guilty of maintaining a common nuisance, the acts complained of must be viewed in the light of all the surrounding circumstances and conditions, and if, when so viewed, they constitute a nuisance, the nuisance may be abated. Commonwealth v. Miller, 139 Pa. 77, 23 A. S. R. 170, 21 Atl. 138. However, we take it that the extraordinary remedy of closing the business entirely should not be resorted to unless the evidence be clear and convincing not only that the nuisance actually exists, but that it is maintained by the defendant.

Looking at the evidence in the light of these principles we find that a certain number of persons complain of the existence of noxious gases and offensive odors, and insist that they have been injuriously affected by them. On the other hand, many other persons similarly situated, some of them living in the immediate vicinity of the witnesses for the Commonwealth, say that they notice no fumes nor odors of an injurious or offensive character. Even if we concede that this evidence was sufficient to establish the existence of a nuisance, yet it was also necessary to show that the noxious and offensive gases and odors came from the defendant's plant. It is conceded by the Commonwealth that no offensive gases or odors existed at the plant. Its theory is that the gases and odors going into the air are carried away from the plant by the wind, and being heavier than the air, accumulate and settle down in various places in the city. At most, however, this was a mere theory and was not supported by any direct evidence that, after the introduction of the new appliances, any noxious or offensive gases were thrown off by the plant. It is true that the statement of some of the witnesses that the odors were not noticeable prior to the construction of the plant, was a circumstance tending to show that the plant was responsible for the odors, but in estimating the weight of this circumstance, it must not be forgotten that other agencies, producing the same kind of gases and odors, may have increased and developed after the erection of the plant. On the other hand, the evidence for the company is as follows: Other plants engaged in refining crude oil are permitted to carry on their business in and near various towns and cities throughout the country, although they have never taken any precautions to neutralize the odors or consume the gases. Since the find-

ing of the indictment, the defendant has equipped its plant with the best appliances known to science for destroying the gases and odors complained of. One expert, of long experience in such matters, analyzed the gases and gave it as his opinion that their combustion was practically complete. It was conceded that other experts would testify to the same effect. No expert was introduced by the Commonwealth for the purpose of rebutting this evidence. On the contrary, Dr. White was candid enough to admit that he did not know whether any poisonous gas was thrown out after the introduction of the gas to the furnace. He also admitted that the hydrogen sulphide might be consumed by heat in excess of 400 degrees Fahrenheit, and the evidence is uncontradicted that the heat actually applied has a temperature of from 1500 to 1800 degrees Fahrenheit. There was further evidence that the city dumps, exposed sewers and old fashioned vaults, and especially the engines engaged in switching in the railroad yards, emit gases and odors similar to those complained of. In fine, the case is one where not only other causes for the existence of the nuisance complained of were shown, but the evidence of all those who had any technical knowledge on the subject was to the effect that noxious gases and offensive odors were not emitted by the defendant in such quantities as to affect the health, or interfere with the comfort, of the public generally. We therefore conclude that, on the showing made below, the order closing the plant should not have been made, but that the rule should have been discharged.

Judgment reversed and cause remanded with directions to set aside the order closing the plant and to discharge the rule.

Whole court sitting.