## THE HEPPENSTALL CO.

*vs.*

## THE BERKSHIRE CHEMICAL CO.

Superior Court          Fairfield County          File No. 47181

MEMORANDUM FILED JULY 24, 1942.

*Lorin W. Willis,* of Bridgeport, for the Plaintiff.

*Raymond E. Baldwin,* of Bridgeport, for the Defendant.

Memorandum of decision in action to abate nuisance.

O'SULLIVAN, J. In this action instituted on February

20, 1935, a temporary injunction was issued on March 21, 1935, restraining the defendant "from grinding castor bean pomace upon [its] premises located at Howard Avenue in the City of Bridgeport", and "from loading or shipping castor bean pomace from said premises, excepting only by boat, or by rail in the night season", until further order of this court.

Thereafter the matter lay dormant until the middle of last May, when it flared up again as the result of the plaintiff's moving that the defendant be adjudged in contempt because of a claimed violation of the temporary restraining order. The defendant, not to be outflanked, filed a motion that the injunction be dissolved. After discussing in chambers the desirability of obtaining a permanent answer to the questions arising out of the litigation, the parties agreed that the motions should be ignored and the matter be fully heard on the issues created by the pleadings. This course has been pursued.

The difficulties between the parties, as the age of the case indicates, are of ancient origin, tracing their beginnings to the middle twenties. Each owns and, for many years, has operated a manufacturing plant on Howard Avenue, Bridgeport, the plaintiff's being on the westerly and the defendant's on the easterly side of the street, and each being substantially opposite the other. This section of Bridgeport is in a heavily industrialized zone. It is what one commonly calls the gashouse district. In fact, the tanks of the local illuminating company are scarcely three blocks away from the parties' plants. The value of the plaintiff's property runs over $600,000, and is approximately twice that of defendant's, while the annual gross sales of the former, approaching $4,000,000, bear to those of the latter about the same proportion.

At the present time, the plaintiff is engaged to the full limit of its capacity in making forgings exclusively for the war purposes of the United States Government.

The defendant manufactures fertilizer and in connection therewith operates a plant to extract oil from castor beans. At the conclusion of the various processes through which the beans pass, there is left a residue known as pomace, which is highly nitrogenous and an important ingredient for fertilizer of excellence for certain types of crops. This oil plant represents about one-third of the value of the defendant's property. It was put into operation in 1927 and produces today more

than 1,000,000 gallons of castor oil, an amount, I might add, that seems staggering if devoted to the purposes for which, until the trial of the action, I had supposed it was largely limited. But it appears that castor oil has a vast field for utilization, and particularly where the war effort is concerned. Indeed, it is one of the products on the Government's so-called critical list of commodities. Of the defendant's total production, substantially 85% is destined for war purposes. It will be used as a hydraulic fluid in trucks, tanks, airplanes, turrets, gears, recoil mechanisms on cannon, and, to a limited extent, in engine lubrication. It will likewise be used in finishing textile and leather materials which eventually will be fabricated into uniforms, belts, and shoes for the armed forces. It will be used as an emulsion breaker for crude oil, in drawing tubing and wire, and in the manufacture of plastics, rubber products, ammunition, pyrotechnics and adhesives. And it will be broadcasting no military secret to observe that there are but three other castor oil plants in the entire United States.

The beans are shipped by barge to the defendant in large quantities and, upon unloading, are temporarily stored in a hopper preparatory to their being conveyed by belts to various apparatus, such as ovens and presses, housed within the plant. It is needless to detail the stages through which the beans move. Suffice it to say that at one point, after a considerable amount of oil has been extracted, they have been mashed together into a cohesive mass, known as castor bean cake or pomace, a product which, prior to 1935, was cut up into small pieces by a grinding machine. It was against the last mentioned process that the temporary injunction was directed. It is fitting to say that the defendant has honored the restraining order by a continuous and strict compliance with its mandate.

What brought the plaintiff into court was the inability of the defendant to prevent castor bean dust from getting into the surrounding atmosphere with the result that, on certain days, its presence in the plaintiff's plant was manifested by a reaction upon some of the plaintiff's employees. It had been noticeable that certain men had been affected almost from the very day the oil plant began to operate. Of this, the defendant was aware and in an effort to cooperate, tried various measures to rectify the condition. From 1930 on, it spent about $45,000 in the installation of ventilating mechanisms and other appliances designed to catch and dispose of the

dust before it permeated the free atmosphere. In spite of these efforts, the plaintiff's employees still complained and the plaintiff felt warranted in seeking equitable relief from this court.

Since the issuance of the injunction, the amount of castor bean dust in the air has greatly diminished, but on a so-called heavy day or when the wind is in the east, it still persists in entering the plaintiff's plant and continues to cause varying degrees of discomfort to some of the employees and interferes with the performance of their duties.

The men who complain are subject to an allergy. The extent to which they are affected varies greatly. One may indulge in a fit of sneezing; his nose may run and tears come to his eyes. Another may gasp for breath and exhibit symptoms comparable to those seen in the asthmatic. Another may turn cyanotic. One may be unable to work for a short period of time, a matter of minutes or hours. Another may be obliged to quit his work entirely. For the more seriously affected, sleep is difficult and at times, impossible. But whatever the degree of severity, each attack taxes the heart of the sufferer to a greater or lesser extent.

The plaintiff's production has been discommoded by the recurrence of these occasions when certain of its employees are affected, but no effort was made at the trial to translate the loss into dollars. While the records kept in its clinic are not complete, they give some indication of the frequency of the employees' complaints as well as of the number of men involved. These records disclose that since March, 1935, one or more men made complaint on 124 days, which it will be noted, averages one occasion in about every 21 days.

From March, 1935, until June, 1942, the number of employees at the plaintiff's plant increased from 125 to 474. For the past five years, the employment turnover has averaged about 30 a month. Of the hundreds of new employees hired since 1935, only three are reported as having exhibited symptoms caused by castor bean dust. Including these three, 28 employees have complained during that period of time. On 27 occasions, it was necessary for the affected workman to quit his work and go home, and 16 of these 27 occasions were accounted for by one man, a Mr. Marshall, who has been with the company for a long time and who is now in his 73rd year.

The following statistics give a fair picture of the effect upon these men between March 18, 1935, and May 22, 1942.

Employees required to quit work and go home:

| Name | Number of Days |
|---|---|
| Britner | 1 |
| Crump | 1 |
| Csom | 1 |
| Hackey | 1 |
| Marshall | 16 |
| Nagy | 1 |
| Papp | 5 |
| Vaughn | 1 |

Employees reporting to company clinic:

| Name | Number of Days |
|---|---|
| Bacon, Dr. | 13 |
| Bacon, J. | 1 |
| Bierholm | 16 |
| Bonnyman | 9 |
| Britner | 82 |
| Burgman | 7 |
| Caliento | 13 |
| Crump | 84 |
| Csom | 13 |
| Delladonna | 17 |
| Flynn | 1 |
| Gibell | 5 |
| Grant | 4 |
| Hackey | 3 |
| Kasper | 1 |
| Liberty | 4 |
| Macviriz | 1 |
| Marshall | 93 |
| Mayer | 1 |
| Miles | 3 |
| Nagy | 19 |
| Oros, F. | 1 |
| Oros, J. | 1 |
| Papp | 32 |
| Porter | 50 |
| Sekeres | 3 |
| Swartz | 6 |
| Vaughn | 58 |

The following table gives the days of the months through-
out the year when at least one employee reported to the clinic:

1935
March       18, 20, 21, 23, 25, 26, 27, 28, 29
April        1,  2,  4,  5,  6,  8,  9, 10, 12, 25, 29, 30
May          2,  3,  4,  6,  7, 23, 24
June         1,  4, 18, 19, 20
July         9
August      15, 20, 30
September    3,  4,  5,  9, 13, 14, 16, 17
October      9, 10, 16, 21, 30
November    14
December    13, 14

1936
January      3,  4,  6,  7,  8,  9, 15, 25
February    15, 24, 25, 26
March        2,  3,  9, 12, 16, 17, 24
April        2, 10, 15, 30
May          1,  6
June        19, 25, 26

1937
February    18
June        16
July        30
August      25

1938
February     3
August      17, 18
November     3,  4

1939
February     6, 15
March        9
April        9, 28
May          3,  6, 15, 16, 17, 22, 23, 26

1940
January      3, 12, 31
February    15
March        1,  4, 14, 18
April        1,  2,  3, 11
May         14, 15, 21, 23, 24

June        11, 24
July        17, 22
August      13, 22, 28
October     30
December    12, 19, 26, 29

1941
January     3,  9, 23
February    4,  6
March       11
April       7, 16, 17, 21, 29
May         1,  2,  7,  9, 11, 13, 28, 29
June        4,  6, 23
July        14, 15, 16
September   3,  9, 20
October     7 ,
November    6

1942
May         6,  7, 14, 15, 21, 22

These are a fairly imposing set of statistics and one's impulse, I fear, is immediately to seek the means for putting an end to what must be expectant agony for those men grievously allergic to castor bean dust. But as he examines and then re-examines the law, he encounters principles which make impossible the granting of relief in the instant case. And no matter how sympathetic to the alleviation of ills may be the judge, he is, in conscience, bound to apply the law as he sees it to the problem he is called on to decide.

The basic rule which must govern this case may be stated as follows:

An injunction should issue against an actor for a non-trespassory invasion of another's interest in the private use and enjoyment of land if (a) the other has property rights and privileges in respect to the use or enjoyment interfered with; and (b) the invasion is substantial; and (c) the actor's conduct is a legal cause of the invasion; and (d) the invasion is either (1) intentional and unreasonable; or (2) unintentional and otherwise actionable under the rules governing jural rights arising from negligent, reckless or ultra-hazardous conduct; and (e) the effects of the invasion cannot be adequately compensated by money damages or the invasion is of a continuous or frequently recurring character. *Restatement, Torts* §822.

Of these subdivisions, little need be said of (a), (c), and (e), for as to (a), the plaintiff by its ownership of the land upon which its plant stands, has the necessary interest to maintain this action (*Webel vs. Yale University*, 125 Conn. 515); as to (c) the defendant's operation of the castor oil plant is the direct cause of the invasion; and as to (e), even though money damages might compensate for the events of the past, they cannot destroy, or even suspend, the continuity of the invasion.

The difficulties for the plaintiff to surmount are to be found in those essentials stated in (b) and (d). It is required by the former that the invasion be substantial, which means, as the adjective indicates, that the invasion must involve more than slight inconvenience or petty annoyance, for the law will not concern itself with trifles. At first blush, one might well conclude that the invasion in this case meets the required test because the affected employees are subjected to something far more grievous than slight inconvenience or petty annoyance. But the rub is, that the legal formula for determining the substantiality of an invasion uses, as its standard, the effect of the invasion upon normal persons in the particular locality. "If normal persons [working] in the locality would regard the particular situation as definitely offensive or annoying, then the invasion is substantial. If normal persons in that locality would not be definitely annoyed or disturbed by the situation, then the invasion is not substantial even though the idiosyncrasies of the particular plaintiff make it unbearable to him. Rights and privileges in respect to the use and enjoyment of land are based on the general standards of normal persons in the community and not on the standards of the individuals who happen to be using or occupying particular parcels of land at a particular time." *Restatement, Torts* §822, comment on cl. (6). *See, also,* §827, bottom of p. 246.

This leads to the delicate question whether those who are allergic to castor bean dust are legally to be classified as normal persons, for the limited purpose of applying legal principles. The normal person is the average person. He does not represent physical perfection. If in a given community, everyone is nearsighted, the normal person living there would be nearsighted, for that would be the blemish of the average person. However, if but a small fraction of the population was so afflicted, the normal person would not be myopic, for he pos-

sesses only the attributes of well-being or the physical defects of the average man.

The evidence available to the court as to the relative number who are allergic to castor bean dust in the locality under consideration is reflected in the statistics above set forth. Of the 474 employees, only 28 have been listed as complainants. This is slightly less than six per cent of all who work in the plaintiff's plant, while from the defendant's force, which now totals 125, there have been but four cases reported since 1927, two before, and two after 1935. Neither party offered any evidence as to what effect, if any, the employees of other industries in the immediate vicinity experienced from the dust.

It is fair to state that in the locality where the oil plant is located the percentage of persons allergic to the dust is relatively small. Under such circumstances, the conclusion is inevitable that those marked by a castor bean allergy are not normal persons in the legal sense. This statement, of course, is not to be deemed an aspersion on these men who command my sympathy and for whom I would gladly extend relief, were it legally possible.

Perhaps some of the sting of this statement, if sting there is, may be removed by applying an example concerning my own family. Some of us are subject to severe attacks of hay fever, so-called. Depending upon the extent to which others living in this locality are afflicted, those of my family will not legally be normal persons who fail to conform with the average person's subjection to or freedom from this particular allergy.

That the principle now under discussion is sound and quite universal is borne out by decisions in other jurisdictions. I find no Connecticut authority sufficiently in point to cite. *Alabama Power Co. vs. Stringfellow,* 228 Ala. 422, 153 So. 629; *Dorsett vs. Nunis,* 191 Ga. 559, 13 S.E. (2d) 371; *Meyer vs. Kemper Ice Co.,* 180 La. 1037, 158 So. 378; *Petroleum Refining Co. vs. Commonwealth,* 192 Ky. 272, 232 S.W. 421; *Wheat Culvert Co., Inc. vs. Jenkins,* 246 Ky. 319, 55 S.W. (2d) 4; *Dittman vs. Repp.* 50 Md. 516; *Rogers vs. Elliott,* 146 Mass. 349, 15 N.E. 768; *Wade vs. Miller,* 188 Mass. 6, 73 N.E. 849; *Stevens vs. Rockport Granite Co.,* 216 Mass. 486, 104 N.E. 371; *Tortorella vs. Traiser & Co., Inc.,* 284 Mass. 497, 188 N.E. 254; *Melucci vs. Eagan,* 124 N.J. Eq. 241, 1 Atl. (2d) 452.

Consequently, as the invasion by the defendant is not substantial, as the word is legally used, the plaintiff is not entitled to the relief it seeks.

There is another insurmountable difficulty confronting the plaintiff. It is found in subdivision (d) of the rule and requires that the invasion be either (1) intentional and unreasonable, or (2) unintentional and otherwise actionable under the rules governing jural rights arising from negligent, reckless or ultra-hazardous conduct.

The second of these alternatives is inapplicable because the condition created is intentional. "To be 'intentional', an invasion of another's interest in the use and enjoyment of land need not be inspired by malice or ill-will on the actor's part towards the other. An invasion so inspired is intentional but so is an invasion which the actor knowingly causes in the pursuit of a laudable enterprise without any desire to cause harm. It is the knowledge which the actor has at the time he acts or fails to act that determines whether the invasion which results from his conduct is intentional or unintentional." *Restatement, Torts* §825. This definition amply brings the defendant within it.

But whether the invasion is unreasonable is a more elusive problem. An intentional invasion of another's interest in the use and enjoyment of land is unreasonable unless the utility of the actor's conduct outweighs the gravity of the harm. *Restatement, Torts* §826; *Nailor vs. Blakeslee & Sons, Inc.,* 117 Conn. 241.

Entangled in every case involving a nuisance is the problem of weighing conflicting interests that are often most difficult to evaluate. The process has been called the doctrine of "balancing interests" or "balancing conveniences" or "comparison of injuries" or "balancing hardships." The doctrine has been subject to criticism as an odious method by which the larger property owner always has the advantage over the smaller. *Note* 25 Va. L.R. 465, 469. This criticism can hardly be applied to the outcome of the instant case, in as much as the smaller concern is the gainer over the larger by the application of the doctrine. And, by way of parenthesis at this point, it should be observed that this is not a controversy between certain employees and the defendant. It is litigation between two industries in which one is seeking to restrain

the other from certain activities because its production suffers.

The doctrine of balancing interests is well ingrained in equity procedure, although many of the courts which actually apply it refuse to admit it is a part of their practice. They prefer to base their conclusions on the ground that the use to the invader is not unreasonable under all the circumstances. But this is splitting hairs, because, fundamentally, the unreasonableness of an intentional invasion is a problem of relative values to be determined after giving due weight to all of the factors of each case.

That the defendant has made an honest effort to rectify the condition caused by the operation of the oil plant must be conceded by everyone. It has spent thousands of dollars in the installation of ventilating systems and other appliances in the hope that the dust might be controlled. These systems are operating to their maximum efficiency. They have so far reduced the amount of dust in the atmosphere as to make negative to reaction those allergens produced on one occasion from air samples in the plaintiff's plant. Indeed, this is one of the mysteries of the case.

The defendant has sought the advice of specialists, both of local, state and national repute. Officials from the State Department of Health and from the United States Public Health Service are unable to recommend further installations that will completely absorb the dust.

This action, then, is, in effect, not one to abate a nuisance but rather to enjoin the activity itself. This is a serious thing to seek even in normal times, when, were it granted, many employees of the defendant would be thrown out of work and a costly plant would become idle. But far more serious is it in these days of national emergency. This plant is under the supervision of the chemical division of the United States Army. Its product is indispensable to the prosecution of the war. To restrain the defendant at such a time as this is taking a step farther than I would care to go, even were the invasion substantial. The gravity of the harm now caused to the plaintiff is outweighed, it seems to me, by the utility of the conduct of the defendant.

The unreasonableness of an intentional invasion is determined from an objective point of view. The question is not whether a reasonable person in the plaintiff's or defendant's

position would regard the invasion as unreasonable, but whether reasonable persons generally, looking at the whole situation impartially and objectively, would consider it unreasonable. Regard must be had not only for the interests of the person harmed but also for the interests of the actor, for the interests of the community, and, under the present circumstances, for the nation. *Restatement, Torts* §826; *Anno.* 61 A.L.R. 924; *Comment* 37 *Yale L.J.* 96; *Daniels vs. Keokuk Water Works,* 61 Ia. 549; *Richards' Appeal,* 57 Pa. 105; *Ebur vs. Alloy Metal Wire Co.,* 304 Pa. 177, 155 Atl. 280; *Roy vs. Chevrolet Motor Car Co.,* 262 Mich. 663, 247 N.W. 774; *Madison vs. Duck-town S. C. and I. Co., Ltd.,* 113 Tenn. 331, 83 S.W. 658; *Monlezun vs. Jahncke Dry-Docks, Inc.,* 163 La. 400, 111 So. 886.

The plaintiff advances the further claim that section 5908 of the General Statutes, Revision of 1930, expressly affords a right to injunctive relief. The pertinent part of the statute reads that "if any manufacturer shall so carry on his business ....as to constitute a nuisance to the public or to individuals, any persons aggrieved thereby may unite in a complaint to the superior court....for the discontinuance or abatement of such nuisance....If....the court shall be of opinion that the plaintiffs are entitled to a decree, it may make such order.... as it shall find to be necessary."

This, it seems to me, is nothing more than the codification of existing law. To obtain relief under its provisions still requires the plaintiff to establish that the invasion affects nor-mal persons in its plant. And the second sentence of the section goes no farther than to call upon the discretion of the court. Indeed, the statute indirectly recognizes the doctrine of balancing conveniences, for it provides that where the court is of the opinion a decree should enter for the plaintiffs, a restraining order does not necessarily follow. The court *may,* under such circumstances, act, but it is not obliged so to do.

From the foregoing reasoning, it is apparent that no per-manent injunction should issue. Similar reasoning requires the dissolution of the temporary injunction, although it would seem that from the angle of a decent respect for the men who are more seriously affected, the defendant ought to refrain from the grinding of the castor bean pomace.

Enter judgment accordingly, without costs.